FILED
10/6/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT
MPV

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ALEXANDER SISEMORE a/k/a "Kishu Man" and "Kimbo" | Case No.: **1:26-cr-00525**<br>**Judge John Robert Blakey**<br>**Magistrate Judge Laura K. McNally**<br>**RANDOM/Cat. 3**<br><br>Violation: Title 18, United States Code, Section 1343 |

**COUNT ONE**

The SPECIAL NOVEMBER 2025 GRAND JURY charges:

1. At times material to this indictment:

***Defendant and Relevant Individuals and Entities***

a. Kishu Inu was a digital asset, which was first created in or about April 2021.

b. Defendant ALEXANDER SISEMORE, also known as "Kishu Man" and "Kimbo" ("SISEMORE") was a founder and creator of Kishu Inu.

c. Individual A, also known as "Inu Dev" and "Jake," was a founder and creator, and the initial developer of Kishu Inu.

d. Individual B, also known as "Churro," was a large holder of Kishu Inu tokens who performed marketing services and social media moderator services for Kishu Inu.

***Digital Assets and Background of Kishu Inu***

e. A "digital asset" or "digital token" refers to an asset that is issued and transferred using distributed ledger or blockchain technology. As such, the

creation of a digital asset, and transactions in the digital asset, are verified, and records maintained on, a decentralized system using cryptography, rather than through a centralized authority like a bank or government. Like traditional fiat currency, there are various types of digital assets, such as Bitcoin, Ethereum, Litecoin, Tether, and other digital assets, including other stablecoins.

f. A "stablecoin" is a type of digital asset, the value of which is pegged or tied to that of another currency, commodity or financial instrument. Stablecoins are designed to reduce volatility relative to unpegged digital assets like Bitcoin.

g. Digital assets can be transacted on crypto exchanges, which are platforms hosted by companies or other entities that make it convenient for users to purchase, trade and sell digital assets.

h. Gate.io was a global cryptocurrency exchange headquartered in the Cayman Islands.

i. USDT stands for Tether, a stablecoin whose value was designed to stay equal to one U.S. dollar.

j. Kishu Inu was a digital asset launched in April 2021 that subsequently reached a market capitalization of more than $1.6 billion. Subsequent to its launch, Kishu Inu had approximately 283,000 holders. Kishu Inu, like other digital assets, had its transactions recorded on a public ledger commonly referred to as a "blockchain," which acts as an accounting ledger. Unlike a bank's ledger, a blockchain is distributed across participants of the digital currency's entire network.

k. At the time of its initial creation, Kishu Inu was available on the Ethereum blockchain, which was also referred to as Ethereum. As a result, for every transaction involving Kishu Inu tokens, Ethereum recorded, among other things, the date and time of the transaction, the unique digital-asset wallet addresses associated with the transaction, and the amount of the digital asset involved in the transaction. The native cryptocurrency for the Ethereum platform was called Ether and was often abbreviated as "ETH."

l. In digital-asset markets, "liquidity" refers to the ability of a user to convert a digital asset or token into fiat currency or another digital asset or token. If there is liquidity in the market for a particular token, then holders of that token can trade it without significantly affecting that token's market price. If there are more overall holders of a token, that increases the liquidity and ability of existing holders to trade the token. For illiquid tokens, trades of that token can cause large changes in its market price.

m. A "rug pull" is a colloquial term used to describe a scheme in which an issuer of digital assets solicits funds from prospective digital asset investors promising them certain benefits or making certain statements about the potential of the asset, and, once the purchasers' funds are used to purchase the digital asset, the developers abruptly or gradually withdraw from the project, sell or trade some or most of their tokens, and fail to deliver the promised benefits while fraudulently retaining the purchasers' funds.

n. "FUD" is a colloquial term used to refer to investors' "fear, uncertainty, and doubt" in a digital asset's value or potential for growth.

o. As described further below, defendant SISEMORE, Individual A, and Individual B, together with others, created and/or operated a series of websites and published multiple versions of a "white paper" describing, among other things, Kishu Inu's token supply, the properties of Kishu Inu's tokens, the nature of its launch, and its utility to investors. A digital-asset white paper is understood within the digital asset community to be a comprehensive document outlining the technical and economic aspects of a specific digital asset. As in the case of Kishu Inu, white papers are typically authored and/or published by the digital asset's development team or its core members and serve as a guide for investors and potential investors.

p. In the digital asset community, chat groups on social media applications, such as Telegram, Reddit, Instagram, Medium, and Facebook, were a popular way of learning about the value and potential of the digital assets and communicating with the founders and developers of the digital assets or their designated moderators.

***The Scheme to Defraud***

2. Beginning no later than in or around April 2021, and continuing until at least in or around October 2023, in the Northern District of Illinois, Eastern Division, and elsewhere,

ALEXANDER SISEMORE a/k/a "Kishu Man" and "Kimbo,"

defendant herein, together with others known and unknown to the Grand Jury, knowingly devised, intended to devise, and participated in a scheme to defraud and to obtain money and property in connection with the sale of Kishu Inu tokens by means of materially false and fraudulent pretenses, representations, and promises, as further described below.

3. It was part of the scheme that defendant SISEMORE, along with Individual A and others, made materially false statements to investors and potential investors in Kishu Inu in order to maintain its liquidity and increase its price in the cryptocurrency market while surreptitiously selling a large quantity of Kishu Inu tokens that they secretly allocated to themselves at the time they created Kishu Inu. In doing so, defendant SISEMORE and Individual A generated personal profits exceeding $9 million.

4. It was further part of the scheme that on or about April 17, 2021, after having caused to be created and developed that same month one hundred quadrillion Kishu Inu tokens on the Ethereum blockchain, defendant SISEMORE and Individual A received those tokens into a cryptocurrency wallet known as the Kishu Inu Deployer.

5. It was further part of the scheme that after doing so, and before offering them for sale to the public, Individual A transferred approximately 6% of the total Kishu Inu tokens to four Ethereum wallets controlled and owned by SISEMORE and approximately 6% of the total Kishu Inu tokens to four Ethereum wallets that Individual A controlled and owned.

6. It was further part of the scheme that, from at least in or about April 2021 through October 2023, defendant SISEMORE, Individual A, and Individual B, together with others, made or caused to be made materially false statements and representations concerning Kishu Inu to investors and potential investors in Kishu Inu, including the following:

a. That Kishu Inu had been "fair launched" with no "team tokens," meaning that all the Kishu Inu tokens available on the market were purchased by investors, and that the founders and developers had not allocated any tokens to themselves for free at the time of their creation.

b. That the founders and developers of Kishu Inu held only 1.7% of the available Kishu Inu tokens.

c. That the largest holders of Kishu Inu tokens obtained them in a "private sale" rather than an allocation.

d. That the founders and developers were holding their Kishu Inu tokens rather than selling them for their personal benefit.

e. That the founders and developers of Kishu Inu were not engaging in a "rug pull."

7. It was further part of the scheme that after the creation of Kishu Inu, SISEMORE, Individual A, and Individual B began marketing Kishu Inu to investors and prospective investors, including to prospective Kishu Inu investors in the Northern District of Illinois, through a series of websites and white papers they

controlled, owned, or published, that contained, among other things, the following false and fraudulent representations:

a. The website kishuinu.finance, which was launched in or about April 2021, stated that "Kishu Inu was fair-launched, and the dev team has no 'team tokens.' In other words, our creators had to purchase $KISHU on the open-market."

b. The website Kishu.finance, which was launched in or about April 2021, provided a link to a version of its white paper, which further stated that "Kishu Inu was fair-launched, and the dev team has no 'team tokens'. In other words, our creators had to purchase $KISHU on the open-market."

c. The website kishu.com, which was launched in or about May 2021, encouraged investors to "Join the moon mission," suggesting that Kishu Inu's price would continue appreciate to the "moon." The website provided links to Kishu Inu's Telegram group and its white paper.

d. SISEMORE, Individual A, and Individual B published multiple versions of the Kishu Inu white paper in or about April and May 2021. A May 2021 version of the white paper stated that Kishu Inu was "a community-owned project with no tokens reserved for the team. Therefore, it runs primarily on volunteers and donations from the community."

8. It was further part of the scheme that SISEMORE and others made and caused to be made false representations to potential and actual investors intended to induce investors to purchase or hold Kishu Inu tokens when responding to FUD on

social media applications, such as Telegram, Twitter, Facebook, and Reddit, including the following:

a. On or about May 28, 2021, SISEMORE posted or caused to be posted a message to Telegram and Reddit chat groups used by Kishu Inu investors and potential investors attempting falsely to reassure them that the developers purchased their tokens, as opposed to allocating them to themselves, that they owned only 1.7% of the tokens, and that a rug pull was not being perpetrated.

9. It was further part of the scheme that, while making the false and fraudulent statements described above, SISEMORE and Individual A sold their secretly allocated Kishu Inu tokens, resulting in an approximately $9 million profit to SISEMORE and an approximately $800,000 profit to Individual A.

10. It was further part of the scheme that SISEMORE and Individual A concealed and attempted to conceal from potential and actual investors that they, as the founders and largest holders of Kishu Inu tokens, were personally profiting from the sale of their secretly allocated Kishu Inu tokens by employing multiple cryptocurrency wallets and crypto mixers to conduct their transactions.

11. It was further part of the scheme that SISEMORE and Individual A misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the existence and purpose of the scheme and the acts done in furtherance of the scheme.

12. On or about October 27, 2021, in the Northern District of Illinois, Eastern Division, and elsewhere,

ALEXANDER SISEMORE

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an interstate wire transfer, whereby SISEMORE traded 4,735,873,238,550 Kishu Inu for 39,308 USDT via his Gate.io account;

In violation of Title 18, United States Code, Section 1343.

**COUNT TWO**

The SPECIAL NOVEMBER 2025 GRAND JURY further charges:

1. The allegations in paragraphs 1-11 of Count One are incorporated here.

2. On or about October 13, 2021, in the Northern District of Illinois, Eastern Division, and elsewhere,

ALEXANDER SISEMORE

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an interstate wire transfer in when he traded 1,142,273,793,317 Kishu Inu for 2,210 USDT via his Gate.io account;

In violation of Title 18, United States Code, Section 1343.

**COUNT THREE**

The SPECIAL NOVEMBER 2025 GRAND JURY further charges:

1. The allegations in paragraphs 1-11 of Count One are incorporated here.

2. On or about November 6, 2021, in the Northern District of Illinois, Eastern Division, and elsewhere,

ALEXANDER SISEMORE

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an interstate wire transfer in when he traded 3,217,755,209,114 Kishu Inu for 21,398 USDT via his Gate.io account;

In violation of Title 18, United States Code, Section 1343.

**FORFEITURE ALLEGATION**

The SPECIAL NOVEMBER 2025 GRAND JURY alleges:

1. Upon conviction of an offense in violation of Title 18, United States Code, Section 1343, as set forth in this Indictment, defendant shall forfeit to the United States of America any property that constitutes and is derived from proceeds traceable to the offense, as provided in Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2. Upon conviction of an offense in violation of Title 18, United States Code, Section 1957, as set forth in this Indictment, defendant shall forfeit to the United States of America, any property involved in such offense, and any property traceable to such property, as provided in 18 USC § 982(a)(1).

3. The property to be forfeited includes, but is not limited to:

a. a personal money judgment in an amount equal to the proceeds derived from the offense in violation of Title 18, United States Code, Section 1343 and/or property involved in the offense in violation of Title 18, United States Code, Section 1957;

b. the following specific property and balance held in the following accounts and wallet addresses: (i) Crypto.com account for Alexander Sisemore, USER ID: 46320, USER UUID: f2b02763-838f-4589-af75-f6e38da5ccce; (ii) wallet address: 0x991DdE8aa9b3879322D9be79AE7421483a258e1c; and (iii) Wallet address: 0xF26564021f3A4b87A1408162e000AE44121e1014

4. If any of the property described above, as a result of any act or omission by a defendant: cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property, as provided in Title 21, United States Code, Section 853(p).

A TRUE BILL:

________________________
FOREPERSON

______________________________
Signed by Rick Young on behalf of the
UNITED STATES ATTORNEY